MARIA GUATELLI

*v.*

CHARLES J. BROWN et al.

[Decided January 13th, 1915.]

1. That B. misled and induced ignorant and inexperienced women to sign a mortgage intended to secure his own debt, to a third person, which they did not understand, and would not have executed had they been properly advised, B. himself taking their acknowledgment and being bound, as the officer taking the acknowledgment, to make explanation to them suited to their limited intelligence, is ground for declaring it void in his hands.

2. A mortgage is invalid in the hands of an assignee, if there be no consideration for the mortgage or assignment.

3. Trusts may be raised against those participating in indefensible transactions, but not in their favor.

*Mr. John H. McCracken* and *Mr. Brown,* for the complainant.

*Mr. Harry Kalisch,* for the defendants.

STEVENS, V. C.

This is a bill which prays for a decree that a mortgage given by complainant to Henry C. Beach be declared void because procured by fraud.

Maria Guatelli is the widow of Philip Guatelli who died in November, 1904. He was the owner of two improved lots known as Nos. 17 and 18 Grove street, Newark. He occupied a part of the house built on one of these lots and leased the remaining part and the house adjoining. Up to three years prior to his death he had been in the employ of Walters & Brothers, wholesale produce dealers, receiving $18 a week wages. After that time he was unable to work because he had contracted tuberculosis—the disease of which he died. During the years he was unable to work, his support came from the wages of his unmarried

daughter, $7 per week; from benefits from his society of $7 a week or less, and from the net rents of his property, two or three hundred dollars a year. His family consisted of his wife and daughter, the latter being his sole heir-at-law. He left no will and no administration was taken out. The wife is an Italian, unable to read or write. The daughter, married to one Bruni in 1910, appears to be possessed of some intelligence and education, and was at the time of her father's death twenty-four years old.

Philip Guatelli had made the acquaintance of the defendant Charles J. Brown, a note broker, as early as the year 1900. In November of that year he gave to Brown two notes, one for $100 and one for $250. The evidence indicates that they were given for money borrowed, to enable a friend of Guatelli to make a trip to Europe. They do not appear to have been discounted. Several other notes, however, made after that time by Guatelli, were discounted by Brown at the National Newark Banking Company, and their proceeds placed to Brown's credit. Whether they, or some of them, were made for Brown's accommodation or for Guatelli's benefit does not clearly appear from Brown's testimony. All that does appear with any certainty is that notes signed by Guatelli were discounted and placed to Brown's account.

Brown's pass-book with the banking company for the year 1904 was produced and shows that in August, 1904, two Guatelli notes were thus discounted, one for $175, and one for $329, and that in September, 1904, two other Guatelli notes were also discounted, one for $250 and one for, presumably, $300, the amount placed to Brown's credit on this latter being $293.98. None of these notes were produced.

Brown says that Guatelli having died in November, 1904, he went to the widow's house to see about a renewal of the note coming due on December 20th, his first visit being in that month, and his next, two or three months afterward, and that the widow and daughter told him that whatever they owed they would pay; that he repeated his visits at intervals without result until 1910, when hearing that the daughter was about to marry, and fearing trouble from the son-in-law, and fearing, too, that the notes would soon be outlawed, he prepared the mortgage in

controversy and went to the complainant's house with it in August, 1910. This is his account of the interview: "I merely said that I came here to have the mortgage fixed up and the mortgage was all ready and they signed it." The mortgage, he says, was made to secure two of the notes above mentioned, one for $175 and one for $250, amounting in the aggregate to $425, which, with six years' interest, made up the $575, the amount for which it was given.

The transaction was a singular one. In the first place, he himself drew the mortgage, and took the acknowledgment. He knew, probably, that it would not do to take the acknowledgment of a paper made to himself, so he inserted the name Henry C. Beach as mortgagee. He had previously secured Beach's consent to this and he had previously requested Beach to draw a check on the National Newark Banking Company for $575, payable to the order of Mary Guatelli. Beach drew the check but refused to sign it, so Brown took it unsigned, with the mortgage, to Mrs. Guatelli's house, and she and her daughter endorsed it, Mrs. Guatelli doing so by making her mark. Brown afterwards handed back the check to Beach and Beach kept it unsigned. Brown also drew an assignment of mortgage from Beach to himself, but subsequently destroyed it and then, afterwards, wanting, he says, to secure a loan from the defendant Cinnamon, got Beach to execute a second assignment. This latter bears date November 25th, 1912; that is two years and three months after the transaction.

It must be borne in mind that the parties to this peculiar transaction were a shrewd note broker on the one side and two ignorant and inexperienced women on the other, who say, and no doubt, truly, that they knew nothing of Philip Guatelli's note transactions. Their ignorance and inexperience is apparent from the fact that at Brown's request merely, without demur, they executed a bond and mortgage to a man of whom they had never heard and to whom they owed nothing and then endorsed an unsigned check, which could only have been intended to give the affair a false color.

The transaction as a whole must be separated. The first part of it occurred in 1904; the second in 1910. Brown's bank pass-

book for the year 1904 shows that *four* Guatelli notes were discounted and placed to Brown's credit. Brown does not explain how out of the four he selected the two. While he produces the checks to show that he took up the two notes at maturity, he does not produce anything to show that Guatelli received the money on them. Of course, it is elementary law that when a man makes a note, the presumption is that it represents the maker's debt, but notes are often given for the accommodation of the payee, and Brown admits that he and two or three others were using notes in this way. It is at least unfortunate that Brown was unable by any writing to show that he paid to Guatelli what had been placed to his own credit. A check or receipt would have been the appropriate and usual evidence, whether the money was paid before or after the discount. It is not shown that Guatelli either needed or used the money. It may be that the proof is not sufficiently strong to defeat an action on the notes, but it suggests a doubt as to whether Guatelli really received the money This doubt is strengthened by Brown's subsequent conduct. Instead of insisting upon an immediate payment or adjustment of the matter, while the facts were fresh in the recollection of those who had to do with it, he waited for six years, and then in order to keep the matter entirely in his own hands, devised the scheme which enabled him to take the acknowledgment himself. He says he wanted to save lawyer's fees, but as he could have drawn the mortgage to himself just as easily as he could have drawn it to Beach, and as the acknowledgment fee was only the insignificant sum of fifty cents, the hollowness of this pretense is apparent. There is one very significant and undisputed fact. Beach was willing to have the mortgage made to him, but he was not willing to sign the check and have it go through the bank as if it were a real transaction and as Brown intended it should. In other words, when it came to the question of putting a deceitful appearance upon the transaction, he was unwilling to be a party to it. Why the necessity of putting such an appearance if the demand was honest?

Brown does not testify that he explained to the women his reasons for thus coloring the affair or that they understood it. His evidence was: "I merely said that I came here to have the

mortgage fixed up and the mortgage was all ready and they signed it." It is hard to resist the conclusion that he did not fairly explain the transaction. Asked, on cross-examination, to say why he told them to endorse the check, he said he could not.

I have thus far considered the case from the standpoint of Brown's version of the affair. Mrs. Guatelli and her daughter give a different account of it. Guatelli, as I have said, borrowed money from Brown in 1900 to enable a friend of his to go to Germany and gave two notes for $100 and $250, both of which were produced. The notes, which do not appear to have been discounted, were at the time they were made secured by a mortgage of $350. Mrs. Guatelli and her daughter both testify that it was of the $350 indebtedness that Brown spoke whenever he came to see them. In 1908 they appear to have paid $25 on account of this indebtedness, for Brown has himself endorsed the payment on the notes, which evidence it. They say, moreover, that it was of this indebtedness that he spoke when he brought them the mortgage telling them that the $575 included the interest they owed. People sufficiently ignorant to sign, without explanation, a bond and mortgage, made out to a man to whom they owed nothing, and to endorse an unsigned check, would be ignorant enough to sign a second mortgage to secure back interest. But it is not necessary to base the decision upon this evidence, nor to decide whether the notes of $175 and $250 really represented money lent. There is evidence enough on the face of the papers and on the undisputed facts to warrant the conclusion that Brown misled the women, and induced them to sign papers, which they did not understand and would not have executed had they been properly advised. Brown by putting himself in the position of an officer taking the acknowledgment was bound to make an explanation of them suited to their limited intelligence.

Another view of the matter leads to a similar conclusion. It is held, in *Bogart* v. *Stevens, 69 N. J. Eq. 800,* that if a mortgage is delivered to A without consideration, in order that A may raise money on it for the mortgagor, it becomes valid in the hands of A's assignee for the money paid therefor by such assignee. Mr. Justice Dixon says: "Although the contract as

between the parties was wholly without consideration, yet if made for assignment, and if assigned for a consideration, the latter becomes the consideration of the original contract."

In the case in hand, the mortgage ·to Beach was admittedly without consideration given by Beach. Was it then made for assignment? Undoubtedly, Brown intended it to be made for assignment, but there is no evidence that the Guatellis did. Was it in fact assigned for consideration? Certainly, there was no consideration moving from Brown to Beach. Was there then any moving from Brown to the Guatellis? Brown says that he gave up the notes: the two women say that he did not. I think the weight of the evidence is with them. The case then seems to be this: The mortgage in the hands of Beach was unenforceable. It remained unenforceable for over two years. Then it was assigned to Brown. How could the assignment give it validity? It may be said that it had validity from its inception on the theory that Beach held as trustee of Brown. But it seems to me that before a trusteeship of this sort could arise the parties must have all concurred in making it. The transaction was not on its face a trust. A bond was given to Beach creating, apparently, an indebtedness to him. This rather negatives than suggests the idea of a trust in favor of Brown. The endorsed, but imperfect, check negatives the idea that a trust was intended. To transform so irregular and, I may say, reprehensible a transaction into a trust for Brown's benefit, would not be doing equity. Trusts are often raised *against* those who participate in indefensible transactions, but not in their favor.

I think the bond and mortgage should be declared void.